AES:LKG
F. #2019R01646

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -

YINGHANG YANG,
      also known as "James Yang,"

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANT

(18 U.S.C. § 371)

20-MJ-820

EASTERN DISTRICT OF NEW YORK, SS:

      IVAN B. LAI, being duly sworn, deposes and states that he is a Special Agent

with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting

as such.

      Upon information and belief, in or about and between April 2019 and October

2019, both dates being approximate and inclusive, within the Eastern District of New York

and elsewhere, the defendant YINGHANG YANG, also known as "James Yang," together

with others, did knowingly and willfully, directly and indirectly, conspire to use and employ

manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules

and Regulations of the United States Securities and Exchange Commission, Title 17, Code of

Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and

artifices to defraud; (b) making one or more untrue statements of material fact and omitting

to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and (c) engaging in one or more

acts, practices and courses of businesses which would and did operate as a fraud and deceit upon persons, to wit: on the basis of material, nonpublic information that YANG obtained through his employment, YANG executed or caused to be executed profitable transactions in the securities of multiple issuers, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.     I have been a Special Agent with the FBI for approximately 17 years. I am currently assigned to an FBI squad that investigates securities fraud, wire fraud and other financial crimes.   During my tenure with the FBI, I have participated in numerous financial fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations and analyzing telephone toll information.   During the course of these investigations, I have served as the lead or co-lead investigator in the investigation and prosecution of persons involved in securities fraud and money laundering, among other crimes.

2.     I have personally participated in the investigation of securities fraud conspiracy by the defendant YINGHANG YANG, as discussed below.   I am familiar with

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents involved in this investigation, and (c) my review of various records, among other sources of evidence.

3.     Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents.   Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant YINGHANG YANG, I have not set forth each and every fact learned during the course of this investigation.   Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein.   In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

I.     Relevant Entities and Individuals

4.     The Company was a publicly-traded corporation headquartered in New York, New York, that specialized in financial information and analytics.   The Company published a number of market indices, including American stock market indices based on the market capitalizations of various groups of companies with shares listed on the New York Stock Exchange ("NYSE") or the NASDAQ Stock Market ("NASDAQ").

5.     The defendant YINGHANG YANG, also known as "James Yang," was a resident of Flushing, New York.   Since approximately September 2018, YANG has been an employee of the Company.   According to YANG's LinkedIn profile, YANG was a Senior Index Manager at the Company and his job responsibilities included managing

American stock market indices with more than $60 billion in asset value tracking and membership on the Index Committee.   As further indicated by YANG's LinkedIn profile, YANG was a member of the Index Committee at the Company.   According to publicly available information, the Index Committee reviews companies that are being considered as candidates for addition to an index, and any significant market events.

6.     Co-Conspirator 1 ("CC-1"), an individual whose identity is known to the affiant, was a resident of Corona, New York.   CC-1 had a brokerage account (the "CC-1 Brokerage Account") with a major financial services provider (the "Financial Services Provider").

7.     Axon Enterprise ("Axon") was a publicly traded technology and weapons company with its headquarters in Scottsdale, Arizona.   Shares of Axon traded on the NASDAQ under the ticker symbol "AAXN."

8.     Cars.com was a publicly-traded e-commerce company with its headquarters in Chicago, Illinois.   Shares of Cars.com traded on the NYSE under the ticker symbol "CARS."

9.     CDW Corp. was a publicly-traded technology company with its headquarters in Lincolnshire, Illinois.   Shares of CDW Corp. traded on the NASDAQ under the ticker symbol "CDW."

10.     Cleveland-Cliffs Inc. ("Cleveland-Cliffs") was a publicly-traded mining company with its headquarters in Cleveland, Ohio.   Shares of Cleveland-Cliffs traded on the NYSE under the ticker symbol "CLF."

11.     Etsy Inc. ("Etsy") was a publicly-traded e-commerce company with its headquarters in Brooklyn, New York.   Shares of Etsy traded on the NASDAQ under the ticker symbol "ETSY."

12.     Genomic Health, Inc. ("Genomic") was a publicly-traded genetic research company with its headquarters in Redwood City, California.   Shares of Genomic traded on the NASDAQ under the ticker symbol "GHDX."

13.     GrubHub Inc. ("GrubHub") was a publicly-traded e-commerce company with its headquarters in Chicago, Illinois.   Shares of GrubHub traded on the NYSE under the ticker symbol "GRUB."

14.     Las Vegas Sands Corp. ("Las Vegas Sands") was a publicly-traded resort and casino company with its headquarters in Las Vegas, Nevada.   Shares of Las Vegas Sands traded on the NYSE under the ticker symbol "LVS."

15.     National Beverage Corp. ("National Beverage") was a publicly-traded beverage company with its headquarters in Fort Lauderdale, Florida.   Shares of National Beverage traded on the NASDAQ under the ticker symbol "FIZZ."

16.     Pacira BioSciences, Inc. ("Pacira") was a publicly-traded biotechnology company with its headquarters in Parsippany, New Jersey.   Shares of Pacira traded on the NASDAQ under the ticker symbol "PCRX."

17.     PriceSmart, Inc. ("Pricesmart") was a publicly-traded warehouse club company with its headquarters in San Diego, California.   Shares of PriceSmart traded on the NASDAQ under the ticker symbol "PSMT."

18.     RPC, Inc. ("RPC") was a publicly-traded oil and gas services company with its headquarters in Atlanta, Georgia.   Shares of RPC traded on the NYSE under the ticker symbol "RES."

19.     T-Mobile US, Inc. ("T-Mobile") was a publicly-traded telecommunications company with its headquarters in Bellevue, Washington.   Shares of T-Mobile traded on the NASDAQ under the ticker symbol "TMUS."

20.     Vector Group Ltd. ("Vector") was a publicly-traded holding company with its headquarters in Miami, Florida.   Shares of Vector traded on the NYSE under the ticker symbol "VGR."

II.     Relevant Regulatory Principles and Definitions[2]

21.     An "issuer" is a legal entity that develops, registers and sells securities to finance its operations.   Issuers may be companies, corporations, investment trusts, or domestic or foreign governments.   Issuers are legally responsible for the obligations of the issue and for reporting financial conditions, material developments and any other operational activities as required by the regulations of their jurisdictions.   Issuers make available different types of securities, including preferred stocks, bonds and options.

22.     A "stock" is a type of security that signifies proportionate ownership in the issuing corporation.   This entitles the stockholder to that proportion of the corporation's assets and earnings.

23.     An "option contract," commonly referred to as an "option," is an agreement between two parties to facilitate a potential transaction on the underlying security

---

[2] The information set forth in this section is based on my training and experience.

at a preset price, referred to as the strike price, prior to the expiration date.   The two types of option contracts are "put" and "call" options, both of which can be purchased to speculate on the direction of stocks or stock indices, or sold to generate income.   For stock options, a single contract covers 100 shares of the underlying stock.

24.    A "put option" gives the holder of the option the right, but not the obligation, to sell a specified amount of the underlying security at a specified price within a specific time period.   Generally, the holder of a put option anticipates that the price of the underlying security will decrease during a specified amount of time.

25.    A "call option" gives the holder of the option the right, but not the obligation, to purchase a specified amount of the underlying security at a specified price within a specific time period.   Generally, the holder of a call option anticipates that the price of the underlying security will increase during a specified amount of time.

26.    A "brokerage account" is an arrangement where an investor deposits money with a licensed brokerage firm, who places trades on behalf of the customer. Although the brokerage executes the orders, the assets belong to the investors.

27.    A "market index" is a hypothetical portfolio of investment holdings which represents a segment of the financial market.   The calculation of the value of a market index comes from the prices of the underlying holdings.

28.    An "index fund" is a type of mutual fund with a portfolio constructed to match or track the components of a particular market index.   In general, if an issuer is added to a market index, any index fund tracking that market index will purchase shares of that issuer; by contrast, if an issuer is deleted from a market index, any index fund tracking that market index will sell shares of that issuer.

29.     An "Internet Protocol" address ("IP address") is a numerical label assigned to each device (e.g., computer, printer) participating in a computer network that used the Internet Protocol for communication.   An IP address serves two principal functions: host or network interface identification and location addressing.   Because every device that connects to the internet uses an IP address, IP address information can identify computers and other devices that are used to access the internet.

III.    The Fraudulent Scheme

A.      Overview

30.     In or about and between April 2019 and October 2019, the defendant YINGHANG YANG and CC-1 engaged in a fraudulent scheme whereby they executed securities transactions in the CC-1 Brokerage Account based, in whole or in part, on material nonpublic information obtained by YANG in the course of his employment at the Company about issuers that were to be added to, or subtracted from, market indexes published by the Company.

B.      The Co-Conspirators' Relevant Pre-Trading Actions

31.     The defendant YINGHANG YANG opened a brokerage account with the Financial Services Provider on or about June 26, 2017 (the "Yang Brokerage Account").

32.     On or about April 15, 2019, the defendant YINGHANG YANG wrote a check for $3,000 to CC-1, which was deposited into CC-1's bank account ("CC-1's Bank Account") on April 22, 2019.

33.     Approximately one month later, on or about May 22, 2019, CC-1 opened the CC-1 Brokerage Account.

34.     On or about May 23, 2019, the defendant YINGHANG YANG made a $1,000 payment to CC-1 that was deposited in CC-1's Bank Account.

35.     The CC-1 Brokerage Account was funded by deposits totaling $3,000. An initial deposit of $2,000 was made on or about June 6, 2019, and a second deposit of $1,000 –which was transferred directly from CC-1's Bank Account – was made on or about July 5, 2019.

36.     On or about June 20, 2019, CC-1 signed an Options Trading Agreement for the CC-1 Brokerage Account.

37.     Phones associated with the defendant YINGHANG YANG and CC-1 indicate that YANG and CC-1 spoke to each other on numerous occasions between April 15, 2019 and July 5, 2019, including on April 22, May 22, May 23 and June 6, 2019, the dates of some of the relevant activities described above.

C.     Illegal Trading Activity in the CC-1 Brokerage Account

38.     On or about and between June 24, 2019 and October 2, 2019, the CC-1 Brokerage Account engaged in a series of securities transactions related to 14 issuers that were either added to, or removed from, various American stock market indices published by the Company during that time period (the "Index Issuers").

39.     The transactions for each issuer generally followed a similar pattern. First, the CC-1 Brokerage Account would purchase either call options or put options in a particular Index Issuer on a weekday during market hours.[3]   Second, after market hours on

---

[3] Both the NYSE and the NASDAQ are open Monday to Friday between 9:30 a.m. and 4:00 p.m. Eastern Standard Time.

that same day, the Company would announce that the same Index Issuer would be added to, or removed from, a certain American stock market index published by the Company.[4] Finally, shortly after the announcement, the CC-1 Brokerage Account would liquidate its position in the Index Issuer.   The CC-1 Brokerage Account purchased call options for the 13 Index Issuers that the Company announced would be added to a Company market index, and purchased put options for the one Index Issuer that the Company announced would be removed from a Company market index.

40.     The following are transactions engaged in by the CC-1 Brokerage Account in the Index Issuers during the relevant time period:

a.      On or about June 24, 2019, beginning at approximately 4:00 p.m.,[5] the CC-1 Brokerage Account entered orders to buy AAXN call options.   The same day, at 5:15 p.m., the Company announced the addition of Axon to one of the Company's market indices, effective prior to the open of trading on July 1, 2019.   However, the Financial Services Provider did not fill the AAXN order until on or about June 25, 2019, and the options expired without being sold or otherwise exercised, ultimately leading to a loss of approximately $405.

b.      On or about July 9, 2019, beginning at approximately 1:25 p.m., the CC-1 Brokerage Account entered orders to buy TMUS call options.   The same day, at 5:15 p.m., the Company announced the addition of T-Mobile to one of the Company's

---

[4] The Company's Index Policy indicates that announcements of additions and deletions of issues from its various market indices are made after market hours at 5:15 p.m. Eastern Standard Time and posted to the Company's website.

[5] All times in this Complaint are in Eastern Standard Time.

indices, effective prior to the open of trading on July 15, 2019.   The CC-1 Brokerage Account sold the TMUS call options on or about July 10, 2019 at approximately 7:49 a.m., realizing a gain of approximately $1,096.

        c.      On or about July 23, 2019, beginning at approximately 1:50 p.m., the CC-1 Brokerage Account entered orders to buy GHDX call options.   The same day, at 5:15 p.m., the Company announced the addition of Genomic to one of the Company's indices, effective prior to the open of trading on July 29, 2019.   The CC-1 Brokerage Account sold the GHDX call options on or about July 24, 2019, realizing a gain of approximately $1,710.

        d.      On or about July 25, 2019, beginning at approximately 3:46 p.m., the CC-1 Brokerage Account entered orders to buy VGR call options.   The same day, at 5:15 p.m., the Company announced the addition of Vector to one of the Company's indices, effective prior to the open of trading on August 1, 2019.   The CC-1 Brokerage Account sold the VGR call options between on or about July 26 and August 1, 2019, realizing a gain of approximately $5,750.

        e.      On or about July 31, 2019, beginning at approximately 3:32 p.m., the CC-1 Brokerage Account entered orders to buy RES call options.   The same day, at 5:15 p.m., the Company announced the addition of RPC to one of the Company's indices effective, prior to the open of trading on August 6, 2019.   The CC-1 Brokerage Account sold the RES call options on or about August 2, 2019, resulting in no gain or loss.

        f.      On or about August 1, 2019, beginning at approximately 3:54 p.m., the CC-1 Brokerage Account entered orders to buy GRUB call options.   The same day, at 5:15 p.m., the Company announced the addition of GRUB to one of the Company's

indices, effective prior to the open of trading on August 9, 2019.   The CC-1 Brokerage Account sold the GRUB call options on or about August 2, 2019, realizing a gain of approximately $3,000.

g.      On or about August 1, 2019, beginning at approximately 3:57 p.m., the CC-1 Brokerage Account entered orders to buy FIZZ call options.   The same day, at 5:15 p.m., the Company announced the addition of National Beverage to one of the Company's indices effective prior to the open of trading on August 7, 2019.   The CC-1 Brokerage Account sold the FIZZ call options on or about August 2, 2019, realizing a gain of approximately $6,600.

h.      On or about September 6, 2019, beginning at approximately 3:58 p.m., the CC-1 Brokerage Account entered orders to buy CARS put options.   The same day, at 5:15 p.m., the Company announced the removal of Cars.com from one of the Company's indices, effective prior to the open of trading on September 23, 2019.   The CC-1 Brokerage Account sold the CARS put options on or about September 9, 2019, realizing a gain of approximately $2,000.

i.      On or about September 6, 2019, beginning at approximately 3:59 p.m., the CC-1 Brokerage Account entered orders to buy ETSY call options.   The same day, at 5:15 p.m., the Company announced the addition of Etsy to one of the Company's indices, effective prior to the open of trading on September 23, 2019.   The CC-1 Brokerage Account sold the ETSY call options on or about September 9, 2019, realizing a gain of approximately $1,770.

j.      On or about September 17, 2019, beginning at approximately 3:06 p.m., the CC-1 Brokerage Account entered orders to buy CDW call options.   The same

day, at 5:15 p.m., the Company announced the addition of CDW Corp. to one of the Company's indices, effective prior to the open of trading on September 23, 2019.   The CC-1 Brokerage Account sold the CDW call options on or about September 18, 2019, realizing a gain of approximately $112,487.

k.       On or about September 20, 2019, beginning at approximately 3:56 p.m., the CC-1 Brokerage Account entered orders to buy PSMT call options.   The same day, at 5:15 p.m., the Company announced the addition of PriceSmart to one of the Company's indices, effective prior to the open of trading on September 26, 2019.   The CC-1 Brokerage Account sold the PSMT call options on or about September 23, 2019, realizing a gain of approximately $225,765.

l.       On or about September 24, 2019, beginning at approximately 2:37 p.m., the CC-1 Brokerage Account entered orders to buy PCRX call options.   The same day, at 5:15 p.m., the Company announced the addition of Pacira to one of the Company's indices, effective prior to the open of trading on September 30, 2019.   The CC-1 Brokerage Account sold the PCRX call options on or about September 25, 2019, realizing a gain of approximately $71,324.

m.       On or about September 26, 2019, beginning at approximately 1:48 p.m., the CC-1 Brokerage Account entered orders to buy LVS call options.   The same day, at 5:15 p.m., the Company announced the addition of Las Vegas Sands to one of the Company's indices, effective prior to the open of trading on October 3, 2019.   The CC-1 Brokerage Account sold the LVS call options between on or about September 27 and October 3, 2019, realizing a gain of approximately $325,956.

n.      On or about October 2, 2019, beginning at approximately 2:47 p.m., the CC-1 Brokerage Account entered orders to buy CLF call options.   The same day, at 5:15 p.m., the Company announced the addition of Cleveland-Cliffs to one of the Company's indices effective prior to the open of trading on October 8, 2019.   The CC-1 Brokerage Account sold the CLF call options on or about October 3, 2019, realizing a gain of approximately $155,029.

41.      During the relevant time period, on dozens of occasions, IP addresses associated with the defendant YINGHANG YANG's residence, YANG's employer (the Company) and CC-1's employer all logged onto the CC-1 Brokerage Account.   The IP addresses associated with YANG's residence and employer also logged on to the Yang Brokerage Account during the same time period.

42.      Phones associated with the defendant YINGHANG YANG and CC-1 exchanged dozens of telephone calls during the relevant time period.

43.      The Yang Brokerage Account did not engage in any securities transactions in the Index Issuers during the relevant time period.

44.      In total, the securities transactions engaged in by the CC-1 Brokerage Account in the Index Issuers during the relevant time period generated profits of approximately $912,082 and returns as high as 624%.

D.      Payments from the CC-1 Brokerage Account to YANG

45.      On or about October 4, 2019, three sequential checks were written from the CC-1 Brokerage Account, which held the profits from the scheme, to the defendant YINGHANG YANG.   The three checks were in the amounts of $50,000, $20,000 and $30,000, and were subsequently deposited into three different bank accounts held in

YANG's name in or about and between October 7, 2019 and October 8, 2019.   YANG used funds from these accounts for personal expenses, including to make credit card payments, to pay student loans and to fund trading activity in the YANG Brokerage Account.

46.   On or about October 9, 2019, a representative of the Financial Services Provider spoke to CC-1 on a telephone call, which was recorded.   The representative sought to verify the $50,000 check CC-1 wrote to the defendant YINGHANG YANG, and CC-1 confirmed the check to YANG.   That same day, phones associated with YANG and CC-1 exchanged multiple telephone calls.

47.   On or about October 10, 2019, a representative of the Financial Services Provider spoke to CC-1 on a telephone call, which was recorded.   The representative sought to verify the $30,000 check CC-1 wrote to the defendant YINGHANG YANG, and CC-1 confirmed the check to YANG.   That same day, phones associated with YANG and CC-1 exchanged multiple telephone calls.

E.   Communications with the Financial Services Provider

48.   On or about October 4, 2019, the Financial Services Provider mailed CC-1 a letter informing CC-1 that the Financial Services Provider periodically reviews customer accounts to ensure adherence to regulatory requirements, including "31 CFR 1023.210," which requires the Financial Services Provider to maintain and update customer information.   With the letter, the Financial Services Provider enclosed a "Customer Information—Individual Occupation" form and directed CC-1 to return the completed form within 45 days.   The letter informed CC-1 that failure to comply could lead to account restrictions and ultimately account closure.

49.     On or about October 13, 2019, at approximately 12:55 a.m., the defendant YINGHANG YANG placed a telephone call to the Financial Services Provider, which was recorded.   On the call, YANG asked questions about trading limits and check writing ability.   YANG asked whether writing checks for personal use triggered a requirement to fill out a 1023.210 form, and referred to a "friend" who was required to fill out such a form.   YANG asked the Financial Services Provider what the 1023.210 regulation was for, and specifically asked whether the form was for anti-money laundering. YANG also indicated that YANG did not want to fill out additional paperwork for additional features.   YANG ended the call by asking if YANG would have to go through the "hassle" of filling out the form if YANG was writing a smaller check, as compared to his "friend," who was writing a bigger check.   The representative of the Financial Services Provider stated that the only way YANG would know is if YANG applied for the check writing feature.

50.     The same day, at approximately 1:12 a.m., CC-1 emailed the Financial Services Provider acknowledging receipt of the October 4, 2019 letter and customer information form and indicated that CC-1 previously provided the requested information.   In the email, CC-1 questioned the need for the information given that "[m]ost of [CC-1's] account balance is from tradings."

IV.   Conclusion

WHEREFORE, your affiant respectfully requests that an arrest warrant be issued for the defendant YINGHANG YANG, also known as "James Yang," so that he may be dealt with according to law.

Because public filing of this document could result in a risk of flight by the

defendant YINGHANG YANG, as well as jeopardize the government's ongoing

investigation, your deponent respectfully requests that this complaint, as well as any arrest

warrant issued in connection with this complaint, be filed under seal.

IVAN B. LAI
Special Agent, Federal Bureau of Investigation

Sworn to before me via telephone
this _18day of September, 2020

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK